IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| DOUGLAS DRWAL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 07-0434 |
| | ) | |
| | ) | |
| BOROUGH OF WEST VIEW, | ) | |
| PENNSYLVANIA, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION

CONTI, District Judge.

In this memorandum opinion the court considers the motion for summary judgment

(Docket No. 25) filed by defendant Borough of West View, Pennsylvania ("West View" or

"defendant"), against all claims asserted by plaintiff Douglas Drwal ("Drwal" or "plaintiff")

under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§12101 *et seq.* and the

Pennsylvania Human Relations Act ("PHRA"), 43 PA. CONS. STAT. ANN. §§951 *et seq.* in his

second amended complaint (Docket No. 17).  After considering the joint statement of material

facts ("joint statement" or "JS (Docket No. 43)),[1] the other submissions of the parties, and the

undisputed facts of record, viewing all disputed facts in favor of the nonmoving party, and

---

[1]The Joint Statement of Facts consists of defendant's statement of material facts with plaintiff's answers in
section I, containing paragraphs 1-274 on pages 1-61, and plaintiff's statement of material facts with defendant's
answers in section II, containing paragraphs 1-224 on pages 62-122.  To avoid any confusion that could arise from
the duplicative paragraph numbers, citations to the joint statement will be referenced as JS I or JS II followed by the
appropriate paragraph number.

drawing all reasonable inferences drawn in favor of plaintiff, defendant's motion for summary judgment will be granted.

## Factual and Procedural Background

In November 1995 West View hired Drwal as a police officer. (JS II. ¶12.) As a police officer, Drwal's duties included, *inter alia*, enforcing the laws of the Commonwealth of Pennsylvania and protecting the citizens of West View. (JS II. ¶13.)

Since 1996 Chief Charles Holtgraver ("Chief Holtgraver") has been the chief of police for West View. (JS II ¶19.) Chief Holtgraver is responsible for overseeing the police department's operations and supervising the police department officers, including the lieutenant and sergeant. (JS II ¶20.) Lieutenant Randall Freedman ("Lt. Freedman") is the officer who is second in command. (JS II ¶¶27-28.) There is some dispute about the extent of the supervisory role of Sergeant James Simmons ("Sgt. Simmons") on the force. Defendant avers that Sgt. Simmons is only responsible for supervising the officers of a shift while he is working that shift, whereas Drwal contends that Sgt. Simmons, at all times, is the supervisor of all West View's police officers. (JS I ¶¶192-95.)

Plaintiff initially experienced symptoms indicative of multiple sclerosis ("MS") in 1996 and again in October 2004. (JS I ¶23-24.) The symptoms he experienced included double vision, tingling sensation in the extremities, pain radiating from the neck to the tail-bone, leg "giving out," incontinence, twitching, and episodic blindness. (JS II ¶35.) According to Drwal, his MS symptoms had "phases of remission," and the manifestation of the symptoms may or may not occur every five to ten years. (JS I ¶26.) Drwal contends that West View Police Officer Todd Towne ("Towne") and Sgt. Simmons ridiculed him and imitated him. (JS II ¶36.)

In October 2004, after West View Police Officer Joseph Connolly ("Connolly") observed Drwal experiencing twitching, back arching, and pain, Drwal told Connolly that he had MS. (JS II ¶37.) Drwal told no one other than Connolly that he had MS. (JS I ¶32.) Drwal asked Connolly to tell the other West View police officers to stop teasing him by imitating his twitching and swearing. (JS II ¶38.) Shortly thereafter, according to Drwal, Lt. Freedman requested that Drwal undergo a physical examination to ensure he was able to do his job because Lt. Freedman had heard that Drwal had MS. (JS II ¶39.) Drwal never received any treatment or medication for his MS. (JS I ¶21.) Drwal never told his primary care physician about his MS. (JS I ¶22.) Drwal never told Chief Holtgraver that he had MS. (JS I ¶19.) In an ADA Questionnaire submitted to the Equal Employment Opportunity Commission ("EEOC"), Drwal stated, "I have been able to perform all major life activities since being diagnosed [with MS]." (JS I ¶25.)

In 2004, an "investigator" position was created on a trial basis by authorization of West View Borough Council (the "Council"). (JS I ¶¶2-3.) Drwal was assigned to the investigator position in or around September 2004 by Chief Holtgraver. (JS I ¶9.) Chief Holtgraver apprised Drwal that it was essential to demonstrate to the Council that the position was necessary by, among other things, submitting monthly reports to the chief for presentation to the Council. (JS I ¶10.) Reports, however, were not always submitted by Drwal while he held the position. (JS I ¶11.) In June 2005, Drwal was informed by Chief Holtgraver that the investigator position was being reassigned to Towne. (JS I ¶12.) Drwal contends that his removal from the investigator position was a demotion, a claim which defendant denies. (JS I ¶¶12, 14-17.)

From August until November 2005, Drwal took a short-term disability leave due to "stress and anxiety." (JS I ¶56, JS II ¶41.) Defendant required Drwal to undergo medical and psychological evaluations before returning to work. (JS I ¶59.) Chris Coburn, Ph.D. ("Dr. Coburn") performed the psychological evaluation of Drwal. (JS I ¶60-61.) A letter dated November 4, 2005, from Dr. Coburn to Chief Holtgraver stated that Drwal's "medical history is significant for a diagnosis of Multiple Sclerosis, which has manifested itself as intermittent episode [sic] of severe pain. He says that the disease has not impacted his ability to function on the job." (JS I ¶62.) Dr. Coburn's acknowledgment of Drwal's MS diagnosis in the letter was based upon the medical history Drwal reported to Dr. Coburn. (JS I ¶63.) Chief Holtgraver claims that he did not believe Drwal had MS after reading Dr. Coburn's letter. (JS I ¶64.)

In 2005, Sgt. Simmons began expressing an interest to Chief Holtgraver in creating a SWAT or SERT or a SWAT/SERT team[2] (hereinafter "SERT team"). (JS I ¶49; JS II ¶45.) Also in 2005, West View purchased three AR-15 rifles. (JS II ¶46.) Drwal characterizes the purchase of the assault rifles as being a response to the proposed SERT team and for better officer protection, whereas defendant maintains the AR-15 rifles were purchased to upgrade the police department's arsenal. (JS II ¶48.)

In December 2005, Drwal heard from Towne that Towne and West View Police Officer Matthew Holland ("Holland") were training for a proposed SERT team. (JS I ¶68.) On December 13, 2005, a police association[3] meeting was held regarding Drwal's request for

[2]SWAT is an acronym for "Special Weapons And Tactics" and SERT is an acronym for "Special Emergency Response Team."

[3]The police association consists of all the full-time West View police officers who have at least one year of service to the department. It is a separate organization from West View and does not conduct official borough business. Chief Holtgraver is not a member of the police association. (JS II ¶¶51-54.)

4

representation related to a disciplinary action.  (JS I ¶70.)  After the matter for which the meeting

had been called was closed, Drwal addressed Sgt. Simmons while the meeting was still in

session.  (JS I ¶73.)  Drwal asked Sgt. Simmons why he was not being considered for training for

the SERT team[4].  (JS I ¶74.)  According to Drwal, Sgt. Simmons replied "because you have MS."

(JS I ¶75.)  Drwal noted to Sgt. Simmons that his comment was discriminatory and asked Sgt.

Simmons if he had ever heard of the ADA.  (JS II ¶4.)  Drwal further stated that he was going to

complain to Chief Holtgraver about Sgt. Simmons' comment.  (JS II ¶5.)  According to Drwal,

Sgt. Simmons responded that Chief Holtgraver was aware of his decision and supported it.  (JS II

¶6.)  Drwal also told Sgt. Simmons that he was going to file a complaint with the EEOC.  (JS II

¶7.)  Chief Holtgraver did not attend this meeting.  (JS I ¶81.)  Drwal never discussed Sgt.

Simmons' comments at the meeting with Chief Holtgraver.  (JS I ¶¶82-83.)

    According to defendant, in early December 2005, the police department's records clerk,

Barb O'Lare ("Ms. O'Lare"), found a misplaced crime lab report on top of a filing cabinet

relating to an arrest for driving under the influence ("DUI").  (JS I ¶161.)  In attempting to locate

the file in which the report belonged, Ms. O'Lare discovered that it had been improperly placed

with the closed cases.  (JS I ¶162.)  Once found, Ms. O'Lare noticed that the file contained a lab

report from a different DUI arrest.  (JS I ¶163.)  Ms. O'Lare brought the situation to the attention

of Lt. Freedman, who forwarded the file to Chief Holtgraver for review.  (JS I ¶164.)  Chief

Holtgraver's review of the file revealed that the DUI charge had been reduced to public

---

[4]Plaintiff's second amended complaint and his deposition testimony refer to this incident as pertaining to training for the SERT team.  (Pl.'s Sec. Am. Compl. (Docket 17) ¶¶ 9, 14, 15, 34, 37; Def.'s Ex. A. (Docket 28) 118-24, 171-72, 190-202.)  In plaintiff's responsive brief and statement of facts, the incident is referred to as pertaining to training on the AR-15 rifles.  (Pl.'s Br. (Docket 32) 1, 13-14, 25 n.42; Pl.'s St. of Facts (Docket 34) ¶¶ 1 n.l,  32, 45-50, 55, 59, 151.)

intoxication. (JS I ¶165.) Defendant maintains that it was this set of circumstances that led to Chief Holtgraver's directive to Lt. Freedman to conduct an investigation of all DUI arrests for all West View officers for the previous two years to ensure that the charges were not being reduced. (JS I ¶¶166-67.) Drwal points out, however, that a letter written by Lt. Freedman on Chief Holtgraver's letterhead indicates that the internal DUI investigation was in response to an offense tracking number ("OTN") request from the county. (JS II ¶63.) The internal DUI investigation was conducted by Lt. Freedman and Ms. O'Lare. (JS I ¶169.) According to defendant the investigation was commenced on December 13, 2005; according to Drwal it was commenced on December 17, 2005. (JS II ¶¶8, 61.) The results of the investigation disclosed a total of four cases in which an arrest was made of an individual impaired by a blood alcohol level above the legal limit, but criminal charges were not filed. (JS I ¶171; JS II ¶66.) The arresting officer in all four incidents was Drwal. (JS I ¶172; JS II ¶66.)

On December 24-25, 2005, Drwal worked the 11 p.m. to 7 a.m. shift with Holland. (JS I ¶102.) During the shift, Drwal's wife called him and asked him to stop home, which Drwal informed Holland was probably for the purpose of stuffing the Christmas stockings of Drwal's children. (JS I ¶103.) Because Drwal lives in West View, he was permitted to go home during his shift breaks. (JS II ¶108.) Drwal stated that prior to going on break he called out to dispatch to inform them that he would "be on portable" radio, which was Drwal's stated break procedure. (JS II ¶¶117-18.) Drwal was at home for forty minutes. (JS I ¶104.) During that time, according to Drwal, his wife was concerned about his son's temperature, and Drwal assured her that he would return to check in. (JS II ¶119.) Drwal maintains that when he returned home for the second time during his shift his son was having a seizure. (JS II ¶120.) Drwal did not call for an

ambulance because, as a first responder, he wanted immediately to address the situation.  (JS II ¶122.)  While Drwal was at home, Holland called him on his cell phone and informed him that dispatch had been unsuccessfully attempting to call him on his portable to respond to an assault report.  (JS I ¶¶111-12; JS II ¶123-24.)  Drwal stated that in certain areas inside his home his portable radio does not transmit.  (JS I ¶113.)  After receiving Holland's cell phone call Drwal responded to the assault, finding, in addition to Holland, an ambulance and police officers from another municipality already on the scene.  (JS I ¶117.)  Following the assault call, Drwal went home to check on his son for approximately twenty minutes.  (JS I ¶118; JS II ¶129.)  Defendant avers that Drwal exceeded his break by about twenty minutes during this shift.  (JS II ¶131.)

West View police officers are required to record their activities from each shift, inclusive of breaks, on a shift activity log.  (JS I ¶119; JS II ¶136.)  Drwal asserts that he lost his shift activity log for the December 24-25, 2005 shift.  (JS I ¶120; JS II ¶137.)  Drwal copied Holland's shift activity log for that shift.  (JS I ¶121.)  Drwal contends that he intended to tell Chief Holtgraver about his son's seizures and that he was not attempting to conceal his whereabouts.  (JS II ¶138.)

West View police cruisers are equipped with GPS units that track the location of the vehicles.  (JS II ¶139.)  According to Drwal, Chief Holtgraver reviews the GPS reports each night, a fact of which the West View police officers are aware.  (JS II ¶¶139-40.)

Chief Holtgraver informed Drwal in a letter dated December 29, 2005, that he was being placed on administrative leave on December 29, 2005, for the mishandling of DUI arrests, failure to respond to a call on December 25, 2005, and submitting a falsified shift activity log for the December 24-25, 2005 shift.  (JS I ¶176; JS II ¶141.)  The letter further advised Drwal that he

would be given a *Loudermill*[5] hearing on January 3, 2006.  At the *Loudermill* hearing, Drwal presented his version of events relating to the incidents referred to in the December 29, 2005 letter.  (JS I ¶178.)

On January 19, 2006, Drwal's employment as a West View police officer was terminated. (JS II ¶143.)  Although the last official act directing the surcease of Drwal's employment was a vote by the Council, Drwal maintains that Chief Holtgraver was responsible for firing him because Chief Holtgraver recommended Drwal's termination, Chief Holtgraver was present during the meeting at which the Council voted in favor of Drwal's termination, and Chief Holtgraver presented a case to the Council for Drwal's termination.  (JS I ¶179.)  The termination decision was communicated to Drwal by a letter dated January 20, 2006, signed by Council President Daniel Daugherty.  (JS I ¶180.)  The letter indicated the reasons for the decision to terminate Drwal's employment were, *inter alia*, mishandling several DUI arrests, violating the break policy on the December 24-25, 2005 shift, being unreachable by dispatch resulting in a failure to respond to a call to assist another officer on that same shift, and submitting a falsified shift activity log for that shift.  (JS I ¶181.)  The grounds for Drwal's termination were neglect of duty and conduct unbecoming an officer.  (JS I ¶183.)

Chief Holtgraver informed Magisterial District Judge Richard Opiela ("MDJ Opiela") by letter dated January 21, 2006, that Drwal was no longer a West View police officer.  (JS I ¶235.) The letter contained Drwal's address and requested that MDJ Opiela's office personally notify Drwal of any hearings at which he was required to appear.  (JS I ¶236.)  Drwal speculates that because he did not receive personal notification of five out of thirty to forty hearings, the letter

---

[5] *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532 (1985).

may not have been delivered. (JS I ¶237.) While Drwal was still employed by West View there were instances where subpoenae or notices to attend hearings were not served on him. (JS I ¶239.) At least once after Drwal's termination one of the constables responsible for serving notices for MDJ Opiela lost or forgot subpoenae to be served on Drwal. (JS I ¶240.) Drwal does not contend that he ever missed a hearing resulting from his not being served with notice of the hearing. (JS I ¶241.) In a case where Drwal was notified of a hearing by a telephone call from an assistant district attorney made a few days prior to the hearing, Drwal does not know whether any subpoenae for that case issued, or if the borough's police department received the same telephone notification from the assistant district attorney that he did. (JS I ¶¶242-43.) Drwal is unaware whether West View received written notice with his name, or if the police department was given the same short notice. (JS I ¶¶244-45.) Drwal was notified the morning of the hearing for one of his DUI cases, and was able to attend. (JS I ¶246.) Drwal does not know that anyone acting on behalf of West View prevented him from receiving notice of that hearing. (JS I ¶247.)

Drwal appealed his termination to West View's civil service commission (the "Commission"). (JS I ¶185.) On August 17, 2006, and August 24, 2006, a hearing was held before the Commission regarding Drwal's appeal. (JS I ¶186; JS II ¶145.) Holland testified at the civil service hearing. (JS II ¶147.) The Commission concluded that West View's decision to terminate Drwal was justified and affirmed the termination. (JS I ¶187.)

On November 16, 2006, West View adopted the Commission's findings. (JS I ¶188.) Drwal appealed the Commission's decision to the Allegheny County Court of Common Pleas. (JS I ¶189.) Drwal did not raise the issue that his disability was a factor in his termination in the state court appeal. (JS I ¶190.) The state trial court found that West View's decision to

terminate Drwal's employment for neglect of duty and conduct unbecoming an officer was supported by substantial evidence and affirmed the Commission's decision.[6]  (JS I ¶191.)

In early March 2006, Drwal filed a discrimination complaint with the EEOC and cross-filed with the Pennsylvania Human Relations Commission ("PHRC") alleging disability discrimination and retaliation.  (JS I ¶269; JS II ¶178.)  Drwal's claims were predicated, in part, upon being removed from the investigator position, failure to be considered for the proposed SERT team, and being terminated.  (JS I ¶270.)  Drwal's complaint did not include any allegations regarding ridicule, mocking or similar harassment.  (JS I ¶271.)  Drwal's complaint did not specify the condition comprising his disability.  (JS I ¶272.)  In October 2006, Drwal's complaint was dismissed by the EEOC.  (JS II ¶179.)  In November 2006, Drwal's complaint was reopened by the EEOC, but dismissed again in January 2007.  (JS II ¶180.)

After Drwal's termination, he was informed by an unnamed individual that Holland and West View Officer John Sweeney were making pejorative remarks about him outside of his presence.  (JS II ¶186.)[7]  Not long afterward, on November 21, 2006,[8] as Drwal was driving past the West View police department, he saw Holland outside and waved to him and Holland and another West View officer approached his vehicle.  (JS I ¶248; JS II ¶¶186-87).[9]  As Drwal and Holland were shaking hands a colloquy transpired.  (JS I ¶249; JS II ¶188.)  Although the parties

---

[6]Drwal appealed the order of the state trial court to the Pennsylvania Commonwealth Court, which affirmed the state trial court's decision in an unreported opinion.  *Drwal v. Borough of West View*, 960 A.2d 967 (Table) (Pa.Cmwlth. Ct. 2008).

[7]JS II contains two paragraphs numbered 186.  This citation refers to the first paragraph numbered 186.

[8]As both parties point out, this date, coincidentally, was five days after both West view's adoption of the Commission's decision and the EEOC's decision to reopen Drwal's discrimination complaint – both occurred on November 16, 2006.

[9]This citation refers to the second paragraph numbered 186.

do not agree about the posture and tone of the conversation, it is generally agreed that Drwal said something to the effect that Holland was "f...ing" with his family and that was "f...ed up" or that Drwal would "f...k" Holland up, and that the handshake persisted for the duration of the twenty to thirty-second exchange.  (JS I ¶249; JS II ¶¶188-91.)  Holland did not arrest Drwal after this encounter.  (JS II ¶192.)  At least part of the confrontation was observed by the other officers, whom defendant avers were Officer John Cordial ("Cordial") and Sgt. Simmons.  (JS I ¶252.)

Later that same day, Sgt. Simmons informed Chief Holtgraver about the interaction between Drwal and Holland.  (JS I ¶253.)  Chief Holtgraver requested statements from Holland, Cordial, and Sgt. Simmons regarding the incident. ( JS I ¶254.) After reviewing the statements, Chief Holtgraver referred the matter to the Allegheny County Police for an independent investigation because he believed the circumstances involved a threat being made against an individual who testified at Drwal's civil service commission hearing.  ( JS I ¶¶255-57.)  Chief Holtgraver was not obligated to turn the matter over to an outside agency for investigation, but it was within his discretion. (JS II ¶198.)  Chief Holtgraver expressed an intent to remain neutral in the investigation to an interviewing officer from the county police.  (JS I ¶258.)

On December 1, 2006, Drwal observed a potential altercation in the parking lot of West View Plaza. (JS I ¶259; JS II ¶202.)  A few minutes later, Drwal entered a restaurant to pick up an order and saw Lt. Freedman, who was on duty and engaged in a cell phone conversation. (JS I ¶¶260-61; JS II ¶¶203-05.)  Drwal did not report the incident transpiring in the parking lot to Lt. Freedman at the time because Lt. Freedman was talking on his cell phone and because Drwal assumed that the confrontation had discontinued of its own volition.  (JS II ¶205.)  After leaving the restaurant, as Drwal was exiting West View Plaza in his vehicle, he witnessed the same

dispute continuing and anonymously called 911 to report a potential fight. (JS I ¶262; JS II ¶206.) The officers responding to the scene were unable to corroborate that the controversy occurred. (JS I ¶263; JS II ¶212.) West View Police Officer Steve Ganster ("Ganster"), one of the officers to respond to the call, called the number from which the 911 report was made and reached Drwal, and the two discussed what Drwal had observed. (JS II ¶207.)

Chief Holtgraver was informed about the circumstances pertaining to the report of an alleged altercation by one of the responding officers, and requested statements from the officers involved in the incident. (JS I ¶¶263-64; JS II ¶213.) Chief Holtgraver turned the investigation of a potential false report over to the Allegheny County Police because of the ongoing investigation of the encounter between Drwal and Holland the previous month. (JS I ¶265; JS II ¶213.)

The Allegheny County police detectives investigating the November 21, 2006 and December 1, 2006 incidents disclosed the results of their investigation to an assistant district attorney, who directed them to file charges of simple assault, terroristic threats, harassment, retaliation against a witness, and false alarm to an agency of public safety against Drwal. (JS I ¶267.) The criminal charges brought against Drwal were all dismissed. (JS II ¶184.)

In April 2007, Drwal filed a second discrimination complaint with the EEOC and PHRC, alleging that West View retaliated against him for filing his initial complaint in March 2006 by frustrating his receipt of notices of hearings requiring his presence and causing criminal charges to be filed against him. (JS I ¶¶273-74.)

## Standard of Review

Federal Rule of Civil Procedure 56(c) provides that summary judgment may be granted if, drawing all inferences in favor of the nonmoving party, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). A motion for summary judgment will not be defeated by the mere existence of some disputed facts, but will be defeated when there is a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In determining whether the dispute is genuine, the court's function is not to weigh the evidence or to determine the truth of the matter, but only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the nonmoving party. *Id*. at 249. The court is to draw all reasonable inferences in favor of the nonmoving party. *El v. Southeastern Pa. Transp. Auth.*, 479 F.3d 232, 238 (3d Cir.2007)("In considering the evidence, the court should draw all reasonable inferences against the moving party."). The United States Court of Appeals for the Third Circuit recently stated:

> [I]f there is a chance that a reasonable factfinder would not accept a moving party's necessary propositions of fact, pre-trial judgment cannot be granted. Specious objections will not, of course, defeat a motion for summary judgment, but real questions about credibility, gaps in the evidence, and doubts as to the sufficiency of the movant's proof, will.

*Id*.

## Discussion

Plaintiff asserts claims of disability discrimination and retaliation under the ADA and PHRA based upon his removal from the investigator position, his non-selection for a SWAT or

SERT team (which was never formed), his failure to be selected among the first group for AR-15 rifle training, his termination on January 19, 2006, his failure to be notified of certain court hearings requiring his attendance, and the initiation of a criminal investigation resulting in charges being filed against him.

### A.  Disability Discrimination Claims

The ADA[10] makes it unlawful for an employer to discriminate against any person with respect to, *inter alia*, advancement, discharge, training, and other terms, conditions, or privileges of employment on the basis of a statutorily recognized disability. 42 U.S.C. § 12112(a).  The Supreme Court recognized that it is often difficult for a plaintiff to prove that an employer acted with "conscious intent to discriminate." *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  One manner in which plaintiffs can meet this ultimate burden of persuasion is by demonstrating that an employer's stated reason for the challenged action is not the true reason, but rather was a pretext for unlawful discrimination. *Texas Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).

### 1.  Prima Facie Case

"In order to make out a prima facie case of disability discrimination under the ADA and PHRA, a plaintiff must establish that [he] (1) has a 'disability,' (2) is a 'qualified individual,' and (3) has suffered an adverse employment action because of that disability." *Buskirk v. Apollo Metals*, 307 F.3d 160, 166 (3d Cir. 2002) (citing *Gaul v. Lucent Techs. Inc.*, 134 F.3d 576, 580 (3d Cir. 1998) (footnote omitted).

---

[10] The ADA and PHRA are analyzed under the same standards.  *Kelly v. Drexel Univ.,* 94 F.3d 102, 105 (3d Cir. 1996).  The resolution of the ADA claims will be dispositive of the PHRA disability discrimination claims.

The first two tasks are to determine if plaintiff is a qualified individual with a disability.

In *Taylor v. Phoenixville School District*, 184 F.3d 296 (3d Cir. 1999), the United States Court of Appeals for the Third Circuit stated:

> A "qualified individual with a disability" is defined by the ADA as a person "with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). A "disability" is defined as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(2).

*Id.* at 305-06 (alteration in original). The court of appeals observed, "[b]efore turning to the first issue, whether [plaintiff] has a disability under the ADA, we mention that we will only discuss [plaintiff]'s ADA claim because our analysis of an ADA claim applies equally to a PHRA claim." *Id.* at 306 (citing *Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996)).

On his ADA Questionnaire submitted to the EEOC, plaintiff stated that his MS did not substantially limit any major life activity. He did not adduce any evidence in the record tending to show that a major life activity is limited by his disability. Therefore, in order to establish a *prima facie* case of disability discrimination, plaintiff must establish either (a) a record of such disability, or (b) that defendant regarded him as having a disability.

### (a)  Record of Disability

The submissions before the court do not establish a record of plaintiff's disability. In order to establish a "record of such impairments," there must exist "a record relied on by an employer indicat[ing] that the individual has or has had a substantially limiting impairment." 29 C.F.R. pt. 1630 App.; 29 C.F.R. § 1630.2(k). In this case, the only record of plaintiff's

impairment appears to be a November 4, 2005 letter addressed to Chief Holtgraver and written by Dr. Coburn, a psychologist who examined plaintiff at defendant's request. In the letter Dr. Coburn stated, "[Plaintiff's] medical history is significant for a diagnosis of Multiple Sclerosis, which has manifested itself as intermittent episode [sic] of severe pain. He says that the disease has not impacted his ability to function on the job." (Def.'s Ex. S, at 1.) The remainder of the letter essentially clears plaintiff for return to full duty from a psychological standpoint. (*Id.*) Dr. Coburn's reference to plaintiff's MS in the letter is based upon the subjective medical history relayed by plaintiff and Chief Holtgraver testified that he did not believe plaintiff had MS even after receiving the letter. Plaintiff must show that "[t]he impairment indicated in the record must be an impairment that would substantially limit one or more of the individual's major life activities." 29 C.F.R. pt. 1630 App.; 29 C.F.R. § 1630.2(k). The letter relates that plaintiff is fit for duty and does not meet this criteria. Under these circumstances no reasonable finder of fact could conclude that this "record" was relied upon by defendant. The court finds that plaintiff can not establish a prima facie case based upon a "record of such impairment" claim.

### (b) Regarded as Having a Disability

The court must determine whether or not plaintiff was "regarded as" having a disability by defendant. To prevail under the "regarded as" prong of the ADA's definition of disability, plaintiff must show that defendant "mistakenly believe[d] that [plaintiff] ha[s] a physical impairment that substantially limits one or more major life activities" or " mistakenly believe[d] that an actual, nonlimiting impairment substantially limits one or more major life activities." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999). Plaintiff must show more than that defendant viewed him as impaired in some way, but rather that defendant viewed him

as disabled "within the meaning of the statute. . . ." *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 381 (3d Cir. 2002).

Plaintiff did not adduce sufficient evidence for a reasonable jury to find that Chief Holtgraver or the Council regarded plaintiff as having a substantially limiting disability. Although plaintiff speculates that Chief Holtgraver knew about plaintiff's MS because of Dr. Coburn's letter, the relatively small size of defendant's police force and the belief that word travels quickly within the department through the "grapevine," plaintiff offered no evidence to suggest that Chief Holtgraver perceived plaintiff as substantially limited as to any major life activities. Chief Holtgraver claims that he did not rely on Dr. Coburn's letter. Additionally, the letter, while indicating that plaintiff said he had been diagnosed with MS, does not suggest that plaintiff was limited as to any major life activity. The only way the letter could be substantial evidence of Chief Holtgraver regarding plaintiff as being disabled under the ADA would be to accept that, for some reason, he believed the part of the letter regarding plaintiff's diagnosis of MS, but did not believe the part of the letter indicating that plaintiff was not substantially limited as to any major life activities. A jury would have to speculate in order to conclude plaintiff was regarded as disabled.

The argument that Chief Holtgraver regarded plaintiff as disabled because he had heard plaintiff has MS through the West View police department grapevine is equally speculative. Initially, even assuming the chief had heard through the grapevine about plaintiff's diagnosis, that would only prove that he had heard someone say that plaintiff has MS – a rumor. Plaintiff cited no precedent, and the court could not find any holding that rumors are sufficient evidence. The court is reminded of the sagacious observation that "[p]eople say believe half of what you

see, [] and none of what you hear."[11]  Even putting that initial hurdle aside, plaintiff failed to

adduce sufficient evidence that Chief Holtgraver heard it rumored that plaintiff has MS and

believed it and that he regarded plaintiff's MS as substantially limiting.  Plaintiff merely posits

that Chief Holtgraver knew about his MS and that is why he removed him from the investigator

position and ultimately decided to terminate him.  In the absence of evidence to support this

assertion, however, no reasonable finder of fact could conclude that Chief Holtgraver regarded

plaintiff as disabled.

      Evidence attributing the same knowledge to the Council is even more exiguous.

Evidence that Sgt. Simmons regarded plaintiff as disabled, specifically his exchange with Drwal

at the December 13, 2005 police association meeting in which he stated that plaintiff was not

being considered for the SERT team because of his MS, is more substantive.  Plaintiff, however,

cannot make out his prima facie case on the "regarded as" claim with respect to Sgt. Simmons'

failure to consider him for the SERT team, or to train on the AR-15 rifles, as the case may be.

Being unable to shoot assault rifles would not establish sufficient ground for a reasonable jury to

find that plaintiff, even though he was a police officer, was regarded as unable to work in a class

of jobs or a broad range of jobs.  There is no evidence of record that plaintiff, a police officer,

was viewed as unable to carry any other kind of firearm or to work as a police officer.  *See*

*Williams v. Philadelphia Hous. Auth. Police Dept.*, 380 F.3d 751 (3d Cir. 2004) (the officer was

unable to carry a firearm).

      Because plaintiff failed to adduce sufficient evidence to establish that he was a qualified

individual with a disability, that he has a record of such disability, or that he was regarded as

---

[11]"I Heard It Through The Grapevine," Norman Whitfield, Barrett Strong ©1966.

having such a disability, he can not make out a prima facie case of discrimination under the ADA and PHRA.

Although plaintiff failed to adduce sufficient evidence to establish a prima facie case of discrimination under the ADA and the PHRA, the court will assume for the purpose of argument that he did and will consider his claims under the remainder of the analysis of the *McDonnell Douglas* framework.

### 2. Legitimate Business Reasons

Once a plaintiff has established a prima facie case the burden shifts to the defendant to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for reasons that are legitimate and nondiscriminatory. *Burdine*, 450 U.S. at 254. An employer satisfies its burden of production by introducing evidence which, taken as true, would permit the conclusion that there was a reason that was not discriminatory for the adverse employment decision. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994); *see generally St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993). It is not necessary for the defendant to persuade the court that it was actually motivated by the reason which it offers. *Burdine*, 450 U.S. at 254; *Bd. of Trs. of Keene State Coll. v. Sweeney*, 439 U.S. 24, 25 (1978).

Defendant offered the improper handling of DUI arrests, violating the break-time policy, failing to follow call-out procedure, failing to respond to a call on the December 24-25, 2005, shift and submitting a false shift activity log for that shift as legitimate, nondiscriminatory reasons for plaintiff's termination. Defendant's reason for removing plaintiff from the investigator position was his failure to submit the required monthly reports to the chief for presentation to the Council. Sgt. Simmons' reason for not selecting plaintiff as one of the first

19

officers for training on the AR-15 rifles was because plaintiff was not as proficient with rifles as Holland and Towne, whom he chose to be the first to be trained. Although Sgt. Simmons said that plaintiff was not being considered for the SERT team because of his disability, a SERT team was never formed and therefore would not constitute an adverse employment action. *Stacey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004) (defining adverse employment action as an action by an employer that is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment.") (citations omitted). Plaintiff's exclusion from a SERT team, which was never formed, need not be included in the court's *McDonnell Douglas* analysis. *Id.* The burden on defendant at this juncture is "relatively light," and defendant can satisfy this burden "by introducing evidence which, *taken as true*, would permit the conclusion that there was a non-discriminatory reason for the unfavorable employment decision. . . ." *Fuentes*, 32 F.3d at 763 (emphasis added)(citations omitted). The court is satisfied that defendant set forth legitimate, nondiscriminatory reasons for plaintiff's termination and met its burden of production.

### 3. Pretext

The last part of the *McDonnell Douglas* analysis requires that,

> [o]nce the employer answers its relatively light burden by articulating a legitimate reason for the unfavorable employment decision, the burden of production rebounds to the plaintiff, who must now show by a preponderance of the evidence that the employer's explanation is pretextual (thus meeting the plaintiff's burden of persuasion).

*Fuentes*, 32 F.3d at 763. Once the employer has stated a legitimate, non-discriminatory reason for the adverse employment action, the plaintiff in order to survive summary judgment must

satisfy at least one of the two prongs articulated by the United States Court of Appeals for the

Third Circuit in *Fuentes*:

> [T]he plaintiff must point to some evidence, direct or circumstantial, from which the fact-finder could reasonably either (1) disbelieve the employers articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.

*Id.* at 764.

A plaintiff must submit evidence that could cause a reasonable fact-finder to discredit the employer's articulated reason for the adverse employment action in order to overcome summary judgment and bring his case to trial. To discredit the employer's articulated reason, the plaintiff does not need to produce evidence that necessarily leads to the conclusion that the employer acted for discriminatory reasons, *Sempier v. Johnson & Higgins*, 45 F.3d 724, 728 (3d Cir. 1995), nor produce additional evidence beyond his prima facie case. *Fuentes*, 32 F.3d at 764. A plaintiff must, however, demonstrate such:

> weaknesses, implausibilities, inconsistencies, incoherencies [sic], or contradictions in the employer's proffered legitimate reasons [such] that a reasonable factfinder could rationally find them "unworthy of credence" and hence infer that the proffered nondiscriminatory reason "did not actually motivate" the employer's action. [*Fuentes*, 32 F.3d] at 764-65 (quoting *Ezold v. Wolf, Block, Schorr, and Solis-Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)).

*Simpson v. Kay Jewelers, Div. of Sterling, Inc.*, 142 F.3d 639, 644 (3d Cir. 1998).

### (a) <u>Prong One</u>

The question asked in prong one of the *Fuentes* test is not whether the employer made the best, or even a sound, business decision, it is whether the real reason for the adverse result suffered by the plaintiff is discrimination. *Keller v. Orix Credit Alliance*, 130 F.3d 1101, 1109 (3d Cir. 1997). The court is neither permitted to get involved in the subjective business decisions of the employer, nor set its own employment standards for the employer, unless there is

evidence of discrimination. *Ezold v. Wolf, Block, Schoor, and Solis-Cohen,* 983 F.2d at 509, 527 (3d cir. 1982). "Furthermore, the court should not examine the issue of whether the employee has skills in an area *other than that identified by the employer* as the basis for his or her termination, because the court would then be impermissibly substituting its own business judgment for that of the employer." *Moorer v. Verizon Commc'ns*, No. 03-1265, 2005 WL 2807140, at *9 (W.D. Pa. Oct. 27, 2005), *aff'd*, 211 F. App'x 98 (3d Cir. 2006) (emphasis in original). "An employment decision that would create a problem under prong one will likely turn on whether the stated reason for termination is so implausible that a factfinder could not believe it to [be] worthy of credence." *Orenge v. Veneman*, No. 04-297, 2006 WL 2711651, at *15 (W.D. Pa. Sept. 20, 2006); *see Menta v. Cmty. Coll. of Beaver County*, 428 F. Supp. 2d. 365, 374 (W.D. Pa. 2006).

Plaintiff offered several "inconsistencies and contradictions" in an attempt to satisfy the first prong of the *Fuentes* test. In challenging the reason for terminating him due to the failure to file charges in the DUI arrests, plaintiff asserts that officers were permitted to wait for the results of the blood alcohol tests to come back before filing charges. Plaintiff, however, failed to introduce any substantive evidence into the record that this was in fact the policy in West View, and the results of the internal DUI investigation revealed that he was the only officer in the department engaging in this practice. Deposition testimony of other West View officers contained in the record overwhelmingly suggests that charges were to be filed the day of or the day after the arrest.

Addressing the issue of violating the break-time policy, plaintiff offers that on the December 24-25, 2005 shift he had gone home three times and exceeded his allotted break time by twenty minutes because his son was having a seizure. Plaintiff asserts that officers were

permitted to take breaks for longer than an hour on Christmas. Despite plaintiff not adducing independent evidence to corroborate his claim that his son was having a seizure, defendant seems to concede that point. Plaintiff contends that officers were permitted to take longer breaks than the allotted one hour on Christmas, but fails to mention that those arrangements were subject to prior approval, a condition with which plaintiff did not demonstrate he complied. Plaintiff failed to address the several other occasions on which he violated defendant's break-time policy for which disciplinary action was pending, which exasperated plaintiff's break-time violation on the Christmas Eve shift, and, if not contributed to, at least was considered among the reasons for his termination according to the January 20, 2006 termination letter.

With respect to failing to follow the call-out procedure and failing to respond to a call on the December 24-25, 2005 shift, plaintiff argues that he did follow the call-out procedure by advising dispatch that he would be "on portable" and that he did respond to the call once he received a cell phone call from Officer Holland. Plaintiff contends that he was not "unreachable" because whether he did not hear the call from dispatch or the call did not transmit, contacting him by cell phone was a viable alternative, and that he did respond immediately once he received the cell phone call from Holland. Holland, however, did not contact plaintiff on his cell phone until after Holland had already responded to the call.

Plaintiff, was unaware whether or not dispatch had his cell phone number. Plaintiff failed to show that a policy existed under which when dispatch was unable to reach an officer on portable, they would then attempt to reach the officer by cell phone. Plaintiff did not establish that when an officer failed to respond to a call, it became the obligation of the responding officer to contact him via cell phone to alert the non-responding officer to the call. It appears by

happenstance that Holland knew or had plaintiff's cell phone number and was able to reach him, thereby allowing plaintiff to respond to the call. Nothing in the record suggests that there was a protocol or procedure for when an officer failed to respond to a call from dispatch. Nothing in the record indicates that such a policy was in place for officers not responding to a call. A jury would have to speculate that contacting "unreachable" officers by cell phone is a "viable alternative" because there was no showing by plaintiff that dispatch or other officers possessed a list of officers' cell phone numbers or that a policy existed directing them to contact officers by cell phone if transmitting a call on a portable failed. Under those circumstances, plaintiff cannot show that he properly responded to the fight call on the December 24-25, 2005 shift, even though he eventually responded to the call.

Plaintiff's explanation for submitting a false shift activity log for the December 24-25, 2005 shift was that he lost his activity log so he copied Holland's log. He argues he did not intend to conceal his whereabouts, and that it would be impossible for him to have concealed his whereabouts because the West View police cruisers were equipped with GPS tracking devices, the reports of which Chief Holtgraver reviewed. By submitting a log inaccurately stating his activities for a shift, plaintiff violated defendant's policy, and plaintiff failed to adduce any substantial evidence to justify doing so. Just because Chief Holtgraver was in a position to detect the misrepresentation by reviewing the GPS report does not lend validity to plaintiff's action of submitting a shift activity log containing false information, whether plaintiff intended to inform the chief of his reason for doing so or not. Furthermore, the court observes, the record does not note that he ever actually did inform the chief.

With respect to defendant's purported SERT team, the court concludes no reasonable jury would find an adverse employment action for non-inclusion on a specially trained task force that never existed in West View. Plaintiff attempts to recast his SERT team argument asserting that he was not selected for training on the department's AR-15 rifles. Initially, the court reiterates that Sgt. Simmons' comment regarding plaintiff's consideration for the SERT team cannot properly be attributed to his consideration for the AR-15 rifle training. To state it another way, a jury would have to speculate about what answer Sgt. Simmons would have given to a question he was never asked. Plaintiff only showed that he was not selected to be in the first group for training. He failed to develop the record regarding which officers were trained on the assault rifles, and those who were not. Under those circumstances, the court is not able to discern whether or not plaintiff's disability played any part in his failure to be trained on the AR-15s. As far as the record reveals, Towne and Holland were the only officers to receive the training, and their selection was based upon their skill with rifles and their being hunters.

Plaintiff asserts that his removal from the investigator position was likewise motivated by discriminatory animus. Although it was a lateral move not effecting compensation or other terms of employment, the court will accept for purposes of argument that the removal did constitute an adverse employment action. Defendant offered that plaintiff's removal from the position was based upon his failure to submit monthly reports to Chief Holtgraver for submission to the Council, a requirement of the position. Plaintiff's counterargument is simply that in some months there was nothing to report. Plaintiff failed to demonstrate, however, that the mere absence of investigations to report vitiated the obligation to submit the report.

The court finds that plaintiff failed to adduce sufficient evidence for a reasonable jury to find the articulated reasons for the adverse employment actions were not worthy of credence.

### (b) Prong Two

The court must examine the second prong of the *Fuentes* framework to determine if plaintiff presented sufficient evidence of pretext. To show that discrimination was more likely than not a cause for the employer's adverse actions, a plaintiff must point to evidence with sufficient probative force that would allow a factfinder to conclude by a preponderance of the evidence that the protected characteristic was a motivating or determinative factor in the employment decision. *Simpson*, 142 F.3d at 644-45. Relevant evidence that could be relied on in the evaluation of this prong includes: (1) whether the employer has previously discriminated against the plaintiff, (2) whether the employer has discriminated against other people within the plaintiff's protected class or within another protected class, or (3) whether the employer has treated more favorably similarly situated persons not within the protected class. *Id.* at 645.

### (1) Previous Discrimination Against Plaintiff

Although plaintiff did not present evidence of previous discrimination against him as such, a review of the record reveals that past actions on behalf of defendant which could be considered discriminatory are requiring plaintiff to provide medical clearance of fitness for duty on two occasions, plaintiff being ridiculed and imitated by other officers because of his disability, plaintiff's failure to be considered for the SERT team and AR-15 rifle training, and the investigation by an outside agency into the mishandling of several DUI arrests.

Plaintiff alleges that shortly after informing Connolly that he had MS, Lt. Freedman[12] required plaintiff to take a physical exam to ascertain his fitness for the job because he had heard that plaintiff had MS. The ADA addresses the conditions under which an employer may require an employee to submit to a medical examination:

> A covered entity shall not require a medical examination and shall not make inquiries of an employee as to whether such employee is an individual with a disability or as to the nature or severity of the disability, unless such examination or inquiry is shown to be job-related and consistent with business necessity.

42 U.S.C. § 12112(d)(4)(A).

The federal regulations clarify that, "[a] covered entity may require a medical examination (and/or inquiry) of an employee that is job-related and consistent with business necessity." 29 C.F.R. § 1630.14(c). The United States Court of Appeals for the Third Circuit has held that medical examinations consistent with business necessity are limited to an evaluation of the employee's fitness for a specific type of work, and "[a] request for such an appropriately-tailored examination only establishes that the employer harbors *doubts* (not certainties) with respect to an employee's ability to perform a *particular* job. Doubts alone do not demonstrate that the employee was held in any particular regard . . ." *Tice v. Centre Area Transp. Auth.*, 247 F.3d 506, 515 (3d Cir. 2001)(emphasis in original). Plaintiff conceded that Lt. Freedman's request that plaintiff submit to a physical exam was "to ensure he was *capable of doing* his job." (JS II ¶39 (emphasis in original).) The requirement that plaintiff take an exam under those circumstances does not constitute evidence of discrimination against plaintiff.

---

[12]Lt. Freedman was acting chief of police at the time.

Before returning from a short-term disability leave from August 2005 to November 2005 due to stress and anxiety, defendant required that plaintiff undergo a medical and psychological evaluation despite plaintiff's having already provided medical clearance to return to work from his own doctor. The previous discussion concerning the circumstances under which it is proper for an employer to require a medical evaluation of an employee applies equally to this allegation. Plaintiff's medical clearance to return to work did not include a psychological evaluation. Because plaintiff's leave was for "stress and anxiety," it was not improper for defendant to request that plaintiff submit to the additional evaluations. Notably, unlike stress and anxiety, MS is not a psychological condition.[13]

Plaintiff contends that from October 2004 through August 2005 he was ridiculed and mocked by his fellow officers because of his MS, specifically that Sgt. Simmons and Towne imitated his neck twitching and swearing which was caused by his MS. An inference of discrimination will be established when a plaintiff presents sufficient evidence that his "workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks and citation omitted). "Occasional insults, teasing, or episodic instances of ridicule are not enough" to be severe and pervasive. *See Jensen v. Potter*, 435 F.3d 444, 451 (3d Cir. 2006), *overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 458 U.S. 53

---

[13]Multiple sclerosis is "[a] chronic disease of the central nervous system . . ., in which there is destruction of myelin and nerve axons within several regions of the brain and spinal cord at different times. This results in temporary, repetitive, or sustained disruptions in nerve impulse conduction, causing symptoms such as muscular weakness, numbness, visual disturbances, or loss of control of bowel, bladder . . . ." Taber's Cyclopedic Medical Dictionary 1398 (20th ed. 2005)

(2006).  While the alleged behavior was unprofessional, and certainly inappropriate, it is similar to the types of "stray remarks" that do not give rise to an inference of discrimination. *See, e.g., Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989) (O'Connor, J. concurring).  Plaintiff did not offer sufficient evidence that the ridicule was evidence of the employer's intent or in any way related to the adverse employment actions plaintiff claims. *See, e.g., Ramirez Rodriguez v. Boehringer Ingleheim Pharm., Inc.*, 425 F.3d 67, 84 (1st Cir. 2005) (statements made by non-decisionmakers or individuals not involved in the adverse employment action in question are insufficient to establish discriminatory animus).

Sgt. Simmons' comment at the police association meeting that plaintiff was not being considered for the proposed SERT team because of his MS is likewise considered a "stray remark" and is not probative evidence of discriminatory intent.  Sgt. Simmons was not a decisionmaker within the hierarchy of West View police department and his comment was not related to the adverse employment actions alleged.  *See Ezold*, 983 F.2d 509 at 545 (stray remarks by non-decisionmakers or even by decisionmakers unrelated to the decision process are minimally probative, particularly where such statements are made in a context removed from the actual decision making process).

Plaintiff also failed to adduce sufficient evidence for a reasonable jury to find that discriminatory animus was a factor in the selection of Holland and Towne to be trained on the AR-15s before him.  Plaintiff failed to show that he was treated differently than all other West View officers, save Holland and Towne, with respect to the training.  He did not present evidence to cast doubt on defendant's reason for selecting Holland and Towne, i.e.,  they were hunters and proficient with rifles.

Plaintiff avers that the criminal investigation of his mishandling of a DUI arrest is evidence of an intervening pattern of antagonism between his complaint at the police association meeting and his termination. Although the events occurred in close temporal proximity, the arrest in question was not discovered by defendant until after plaintiff's complaint was made, which ultimately led up to his termination. Chief Holtgraver contacted the district attorney's office and requested that an investigation be conducted about the manner in which one of plaintiff's arrests was handled after defendant's internal investigation of the department's DUI arrests was concluded. The district attorney's investigation resulted in a finding that there was no criminality. Plaintiff did not dispute that the DUI arrests were improperly handled. Plaintiff did not adduce sufficient evidence that Chief Holtgraver knew about his complaint at the police association meeting prior ot the investigation. Under those circumstances, no reasonable jury could find that plaintiff presented sufficient evidence of previous discrimination for a reasonable jury to find in favor of plaintiff with respect to this factor.

### (ii) Discrimination Against Others

On the record before the court, plaintiff did not adduce evidence that defendant discriminated against other individuals with disabilities or within another protected class. Based upon the undisputed evidence of record, viewing all disputed facts in favor of plaintiff, and drawing all reasonable inferences in favor of plaintiff, the court concludes that a reasonable jury could not find in favor of plaintiff with respect to this factor.

### (iii) Similarly Situated Individuals More Favorably Treated

Plaintiff's evidence that defendant treated more favorably similarly situated individuals not within the protected class consists of showing that other officers who were not in

30

protected classes, 1) were not disciplined for exceeding a break or failing to respond to a call; 2) Towne was not required to submit to a psychological exam upon returning from disability leave; 3) Holland and Towne were considered for a proposed SERT team; and 4) Holland and Towne were considered for training on the AR-15 rifles before plaintiff.

Plaintiff claims that he was treated differently from other employees not in protected classes because other West View officers who missed a call or exceeded a break were not disciplined and he was. Plaintiff, however, must show the other offices were similarly situated. Plaintiff failed to show that another officer outside of protected classes exceeded a break, missed a call and falsified a shift activity log, all on the same shift, and exceeded breaks on other occasions, and mishandled several DUI arrests and was not disciplined. No reasonable finder of fact would conclude that an officer who simply did not respond to a call or an officer who exceeded a break was similarly situated to plaintiff under the circumstances of this case.

Towne's disability leaves were for only physical injuries, in contradistinction to plaintiff's disability leave for stress and anxiety, and as such a psychological exam would not be reasonable or helpful in determining whether Towne was capable of returning to work after a disability leave. Towne was required to provide medical clearance for the conditions for which he was on disability leave, and, as such, was treated no differently than plaintiff.

The court deems it unnecessary to once again offer an analysis regarding the SERT team that did not come into existence or the AR-15 rifle training. The previous discussion on the subject shows that the evidence was insufficient for a reasonable jury to find in favor of plaintiff with respect to this factor.

Under these circumstances plaintiff did not adduce sufficient evidence, with respect to any of his discrimination claims, to show defendant's stated reasons for his termination or any other adverse employment action against him were pretextual. Summary judgment will be granted in favor of defendant with respect to plaintiff's claims for discrimination under the ADA and PHRA.

## B. Retaliation Claims

Plaintiff contends that his termination and various other acts were the result of retaliation for engaging in the protected activity of complaining about discrimination at the December 13, 2005 police association meeting and filing a claim with the EEOC. Retaliation claims brought under the ADA and the PHRA follow the *McDonnell Douglas* framework. *Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 759 n.3 (3d Cir. 2004).

### 1) Prima Facie Case

To establish a prima facie case of retaliation, a plaintiff must demonstrate that: (1) he engaged in protected activity (i.e. filing a claim with the EEOC); (2) the defendant took adverse employment actions against him, and (3) there was a causal connection between the adverse action and his protected activity. *Fogelman v. Mercy Hospital, Inc.*, 283 F.3d 561, 567-68 (3d Cir. 2002).

### (a) Protected Activities

It is undisputed that plaintiff engaged in protected activities satisfying the first element of the prima facie case by (I) complaining about disability discrimination at the December 13, 2005 police association meeting and (ii) filing a complaint with the EEOC in March 2006.[14]

_____

[14]Plaintiff filed a second complaint with the EEOC in April 2007, but does not allege any retaliation on the basis of filing that complaint.

With respect to the second and third elements of the prima facie case, the court will evaluate each allegation of a retaliatory adverse action.

### (b) Adverse Action

Plaintiff generally alleges that he suffered from a pattern of adverse actions. The Supreme Court in *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006), clarified what a plaintiff must show to satisfy the second element of a retaliation claim under Title VII. The court notes that the anti-retaliation provisions of the ADA are not materially different from those contained in Title VII. Therefore, the court will apply the *Burlington Northern* standard to each of plaintiff's retaliation claims. *See Johnson v. McGraw-Hill Cos.*, 451 F. Supp. 2d 681, 710 (W.D. Pa. 2006).

In the context of a retaliation claim, a plaintiff is not required "to show an 'adverse employment action' that 'alters the employee's compensation, terms, conditions, or privileges of employment, deprives him or her of employment opportunities, or adversely affects his or her status as an employee.'" *Moore v. City of Phila.*, 461 F. 3d 331, 341-42 (3d Cir. 2006) (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997), as an example of the former standard. In *Burlington Northern*, the Supreme Court distinguished the statutory language and purposes of the discrimination and retaliation provisions of Title VII and determined that the retaliation provision "is not limited to discriminatory actions that affect the terms and conditions of employment." *Burlington Northern*, 548 U.S. at 64. The Supreme Court concluded that "[t]he scope of the anti-retaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm." *Id.* at 67.

The Supreme Court articulated a new standard and held that a plaintiff claiming retaliation under Title VII must show that a reasonable employee would have found the alleged retaliatory actions "materially adverse" in that they "well might have dissuaded a reasonable person from making or supporting a charge of discrimination." *Id.* at 65. In explaining a "materially adverse" action, the Supreme Court noted the importance of separating "significant from trivial harms" and explained:

> Title VII, we have said, does not set forth "a general civility code for the American workplace." *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80 (1998); *see Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)(judicial standards for sexual harassment must "filter out complaints attacking 'the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing'"). An employee's decision to report discriminatory behavior cannot immunize the employee from those petty slights or minor annoyances that often take place at work and that all employees experience. See 1 B. Lindemann & P. Grossman, Employment Discrimination Law 669 (3d ed. 1996) (noting that "courts have held that personality conflicts at work that generate antipathy" and "snubbing' by supervisors and co-workers" are not actionable under §704 (a)). The anti-retaliation provision seeks to prevent employer interference with "unfettered access" to Title VII's remedial mechanisms. *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997). It does so by prohibiting employer actions that are likely "to deter victims of discrimination from complaining to the EEOC," the courts, and their employers. *Ibid.* And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence. See 2 EEOC 1998 Manual §8, p 8-13.

*Id.* at 68 (internal duplicate citations omitted).

Plaintiff asserts three adverse employment actions allegedly related to plaintiff complaining about discrimination and making his EEOC claim: termination of employment, failure to provide notices of court hearings requiring plaintiff's presence, and the initiation of a criminal investigation of plaintiff resulting in criminal charges being filed. The termination of

plaintiff's employment qualifies as an adverse employment action.  Plaintiff's retaliation claim based upon his failure to receive notices of court hearings requiring his presence is not an adverse employment action for two reasons.  First, plaintiff furnished the record with no evidence whatsoever that defendant was involved in his not receiving the notices.  Second, the failure to receive the notice of those hearings does not meet the "materially adverse" standard announced in *Burlington Northern.*  The retaliation claim based upon the initiation of a criminal investigation resulting in criminal charges being brought against plaintiff does constitute an adverse employment action for purposes of this summary judgment motion.  The court considers plaintiff adduced sufficient evidence to satisfy the second element of a retaliation claim.

### (c) Causal Connection

The third element requires a determination whether plaintiff presented sufficient evidence of a causal link between his protected activity and the adverse action by his employer. To establish a causal connection, plaintiff must show either temporal proximity between the protected activity and the adverse employment action or evidence of ongoing antagonism. *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 288 (3d Cir. 2001).

With respect to the existence of a causal link between the employee's protected activity and the employer's adverse action, two main factors are relevant: (1) timing and/or (2) evidence of ongoing antagonism. *Id* at 288 ("[T]emporal proximity . . . is sufficient to establish the causal link. . . .  [A] plaintiff can [also] establish a link between his or her protected behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the intervening period.").

In the first prong, there must be a close temporal proximity between the protected activity and the adverse employment action. *Id.* While the court of appeals has not enumerated a stringent formula for what is considered to be too long of a gap between the protected activity and adverse action, the courts have held that a time span of several months is too great. *See Williams*, 380 F.3d at 760 (3d Cir. 2004) (two months too long to permit an inference of causation); *George v. Genuine Parts Co.*, No. Civ.A. 3:04-108, 2007 WL 217684, at *11 (W.D. Pa. Jan. 25. 2007) (finding that though suggestiveness is highly sensitive to the facts of each case, a three-month gap "is not so close as to be unusually suggestive of retaliatory motive, especially where an obvious and unimpeached non-retaliatory motive exists.").

The United States Court of Appeals for the Third Circuit has been somewhat ambivalent with respect to whether timing alone is sufficient to satisfy the causation prong of the prima facie case. *See Woodson v. Scott Paper Co.*, 109 F.3d 913, 920 (3d Cir. 1997) ("[T]emporal proximity between the protected activity and the termination is sufficient to establish the causal link."); *Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (causal link established where plaintiff discharged two days following employer's receipt of the plaintiff's EEOC claim); *but cf. Krouse v. American Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997) (causation prong not established on timing alone where nineteen months passed following protected activity and adverse employment action: "Even if timing alone could ever be sufficient to establish a causal link, we believe that the timing of the alleged retaliatory action must be 'unusually suggestive' of retaliatory motive before a causal link will be inferred."); *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 501 (3d Cir. 1991) (affirming lower court's determination that the timing of the plaintiff's discharge alone did not raise an inference of retaliation). Timing, however, in connection with other types of

suggestive evidence, is clearly sufficient to demonstrate the causal link. *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 280-81 (3d Cir. 2000). For example, the court of appeals held that timing combined with evidence of vague or inconsistent reasons given by an employer for an employee's termination was sufficient to satisfy the causation prong of the prima facie case. *Abramson*, 260 F.3d at 289 ("[h]ere, as we found in our discussion of the discrimination claim, [plaintiff] has succeeded in both casting doubt on the reasons [her employer] proffered for her termination, and in demonstrating that those reasons were vague and inconsistent."); *see EEOC v. L.B. Foster Co.*, 123 F.3d 746, 753-54 (3d Cir. 1997), *cert. denied*, 522 U.S. 1147 (1998) (citing *Waddell v. Small Tube Prods., Inc.*, 799 F.2d 69, 73 (3d Cir. 1986)).

With respect to plaintiff's termination, plaintiff stresses that the temporal proximity between the protected activity and the subsequent adverse employment actions is unusually suggestive and is enough, standing alone, to create an inference of retaliation. Specifically, plaintiff asserts that four days elapsed between plaintiff's complaint of discrimination[15] and the initiation of the internal DUI arrest investigation, the results of which defendant affirms was a factor in plaintiff's termination. Plaintiff stresses that ten days passed between plaintiff's protected conduct and the initiation of the criminal investigation of plaintiff. Finally, plaintiff emphasizes that sixteen days transpired between plaintiff's discrimination complaint and plaintiff's forced administrative leave.

There are times that temporal proximity alone can establish causation. *Cardenas v. Massey*, 269 F.3d 251, 264 (3d Cir. 2001)(citing *Jalil*, 873 F.2d at 708). When temporal proximity alone is not clearly suggestive of discriminatory animus, other evidence of retaliatory

---

[15]Plaintiff's argument is based upon plaintiff's complaint of discrimination at the police association meeting, and not his formal EEOC complaint.

motivation must be shown. *Williams*, 380 F.3d at 760. Such evidence may manifest itself as, although is not limited to, an intervening "pattern of antagonism." *Woodson*, 109 F.3d at 920-21 (3d Cir. 1997); *see Robinson v. SEPTA*, 982 F.2d 892, 895 (3d Cir. 1993); *Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173, 177 (3d Cir. 1997). "It is important to emphasize that it is causation, not temporal proximity itself, that is an element of plaintiff's prima facie case, and temporal proximity merely provides an evidentiary basis from which an inference can be drawn." *Kachmar*, 109 F.3d at 178. "The element of causation, which necessarily involves an inquiry into the motives of an employer, is highly context-specific." *Id.*

In the instant matter, the court notes that the time between plaintiff's protected conduct, the complaint of discrimination at the police association meeting, and the commencement of the events that ultimately lead to plaintiff's termination, beginning with the internal DUI investigation[16] four days after the meeting, as well as the termination itself, is a very short span and could give rise to an inference of retaliatory animus for purposes of establishing a prima facie case. Plaintiff, however, did not provide sufficient evidence for a jury to conclude that Chief Holtgraver[17] knew about plaintiff's discrimination complaint at the police association meeting. "It is only intuitive that for protected conduct to be a substantial or motiving factor in a decision, the decisionmakers must be aware of the protected conduct." *Ambrose v. Township of Robinson, Pa.*, 303 F.3d 488, 493 (3d Cir. 2002). Although plaintiff asserts that the chain-of-command policy and the West View police department "grapevine" suggest that Chief

_____

[16]The court understands that the investigation included the DUI arrests of all the West View police officers. The court, however, must view all facts in the light most favorable to plaintiff, and will for purposes of resolving the motion assume that the investigation was the initial adverse employment action.

[17]Again, the court will assume, *arguendo*, that Chief Holtgraver was the decisionmaker with respect to plaintiff's termination for purposes of this discussion. The court notes, however, that plaintiff presented no evidence that any member of the Council was aware of his discrimination complaint at the police association meeting.

Holtgraver was aware of plaintiff's complaint, the court finds that this inference is based upon speculation and does not constitute substantial evidence for purposes of overcoming summary judgment.

Plaintiff maintains that a chain-of-command was in place at the West View police department, and an officer complaint would work its way up from sergeant to lieutenant to chief. Plaintiff argues that when he complained of discrimination at the police association meeting to Sgt. Simmons in the presence of Lt. Freedman, the chain-of-command would operate and either Sgt. Simmons or Lt. Freedman would have necessarily informed the chief. Both Sgt. Simmons and Chief Holtgraver claim that Sgt. Simmons did not inform the chief until after plaintiff's termination. Lt. Freedman denies telling Chief Holtgraver about the complaint at all. Plaintiff offered scant evidence that the chain-of-command policy, as he understood it, was actually in place at West View Police Department. The record is devoid of evidence of even a single instance where the chain-of-command was followed. The complaint occurred at a police association meeting, which is not official West View business. Plaintiff failed to show that the chain-of-command, if it in fact existed, would have operated under those circumstances.

The assertion that Chief Holtgraver would have learned of plaintiff's discrimination complaint through the West View police department "grapevine" is nothing more than speculation. Chief Holtgraver denies hearing about the claim through the grapevine. No West View officer claims to have told Chief Holtgraver about Drwal's complaint prior to his termination. Although plaintiff claims that information travels quickly through West View police department, he provided no evidence to support this assertion.

The court must look to the "entire record before us" to determine whether the causation element is met, and weigh such factors as intervening antagonism, retaliatory animus, and inconsistencies in the employer's articulated reasons for the adverse employment actions. *Farrell*, 206 F.3d at 280-82.

Plaintiff argues that because the internal DUI arrest investigation and the criminal investigation of plaintiff both commenced in the period between plaintiff's protected conduct and plaintiff's final day of work for defendant, this intervening pattern of antagonism is sufficient to show causation. The court discussed above that discovery of the misplaced report which prompted the investigation occurred in the period between the protected activity and the adverse employment action. No reasonable jury could conclude that plaintiff's complaint caused the external investigation.

As discussed above, plaintiff did not proffer sufficient evidence to establish retaliatory animus or to discredit defendant's reasons for his termination. Plaintiff has the burden of establishing all the elements of a prima facie case. Theories and bald assertions do not rise to the level of substantial evidence for purposes of defeating a motion for summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The retaliation claim based upon the initiation of a criminal investigation resulting in criminal charges being brought against plaintiff likewise fails to establish the causal connection requirement of the prima facie case. The only evidence tending to show a connection between plaintiff's protected activity and the adverse event is the close temporal proximity between the reopening of plaintiff's EEOC charge and the initiation of the investigation, a period of five days. Plaintiff's action in the intervening period, however, breaks the causal chain. The investigation

40

was commenced the day after plaintiff's encounter with Holland. Chief Holtgraver's decision to refer the incident to the Allegheny County Police was based on the information he had from officers who had witnessed the event. Plaintiff did not dispute that Chief Holtgraver was given that information by Holland, Cordial and Sgt. Simmons. Whether or not Holland actually feared for his safety and whether or not the charges against plaintiff were eventually dismissed do not negate Chief Holtgraver's reliance on the officers statements. Plaintiff did not dispute that Chief Holtgraver was told plaintiff made potentially false reports to law enforcement, relating to the incident in West View Plaza parking lot. The intervening impropriety breaks the chain of evidence and timing alone under those circumstances will not be sufficient to establish a causal relationship between his protected activity and the initiation of the investigation. *See, e.g., Ober v. Miller*, No. 04-CV-1669, 2007 WL 4443256, at *12 (M.D.Pa. Dec. 18, 2007) (intervening workplace impropriety breaks the chain of causation between protected activity and retaliatory acts).

Thus, the unusually suggestive temporal proximity between plaintiff's complaint and adverse employer action can only be found to be coincidental in the absence of Chief Holtgraver's knowledge at the relevant time about the discrimination complaint. The court finds on the basis of the record before it that plaintiff failed to proffer sufficient evidence for a reasonable fact-finder to infer a causal relationship between his protected activity and the adverse events leading up to and including his termination. Under these circumstances, he cannot establish a prima facie case for retaliation.

## 2. **Pretext**

Even if he had established a prima facie case, he could not establish pretext for the reasons already discussed relating to his discrimination claims.

Plaintiff did adduce sufficient evidence to establish retaliation under the ADA and PHRA. Therefore, summary judgment will be granted in favor of defendant with respect to counts II, III, and V of plaintiff's second amended complaint.

## Conclusion

For the foregoing reasons, defendant's motion for summary judgment will be granted, and the case will be dismissed with prejudice.


By the court:

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge


Dated: March 20, 2009